UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:12-CV-456-F

| | | |
|---|---|---|
| DARWIN JOHNSON, et al., | ) | |
| Plaintiffs, | ) | |
| | ) | O R D E R |
| v. | ) | |
| | ) | |
| CITY OF FAYETTEVILLE, et al., | ) | |
| Defendants. | ) | |

This matter is before the court on the Motion for Partial Summary Judgment filed by

Defendant Heather St. John [DE-208]; Motion for Partial Summary Judgment [DE-238] filed by

Plaintiffs Darwin Johnson, LaTonja D. Johnson, and Brenda Mathis; and the Motion for

Summary Judgment [DE-240] filed by Defendants City of Fayetteville, Shane Koehler, Jennifer

Rodriguez,[1] Phyllis Jernigan, Thomas Bergamine, Dale Iman and Kevin Croyle (collectively,

"City Defendants"). All motions have been fully briefed and are ripe for ruling. For the reasons

stated below, St. John's Motion for Partial Summary Judgment [DE-208] is ALLOWED;

Plaintiffs' Motion for Partial Summary Judgment [DE-238] is DENIED; and the City

Defendants' Motion for Summary Judgment [DE-240] is ALLOWED IN PART and DENIED

IN PART.

## I. PROCEDURAL HISTORY

The procedural history of this case was fully set forth in the court's December 11, 2014

Order [DE-317], and the court sees no need to repeat it here, other than to state what claims

---

[1] Since the filing of this action, Defendant Jennifer Rodriguez has remarried and now goes by Jennifer
Bullington. Dep. of Jennifer Rodriguez [DE-323-2] at 5. The court will refer to her as Rodriguez
throughout this Order.

remain in this action:

1. **Claims against Defendant St. John**: Plaintiff Darwin Johnson's and Plaintiff Brenda Mathis' § 1985 claim for civil conspiracy. Plaintiff LaTonja Johnson's claim for negligence.

2. **Against Officer Koehler in his Individual Capacity**: Plaintiff Darwin Johnson's (1) § 1983 claims for false arrest (unreasonable seizure), excessive force, and malicious prosecution; (2) § 1985 claim for civil conspiracy; and (3) state law claims of IIED, assault and battery, and false imprisonment. Plaintiff Mathis' (1) § 1983 claim of excessive force; (2) § 1985 claim for civil conspiracy; and (3) state law claim for assault and battery.

3. **Against Officer Rodriguez in her Individual Capacity**: Plaintiff Darwin Johnson's and Plaintiff Mathis' § 1985 claim for civil conspiracy.

4. **Against Defendant City of Fayetteville**: Plaintiffs Darwin Johnson's and Mathis' (1) state law claim of negligent hiring, retention, supervision, training, and discipline and (2) municipal derivative § 1983 claims based on a policy or custom.

5. **Against Defendant City of Fayetteville, and Defendants Bergamine and Iman in their Individual Capacity**: Plaintiffs Darwin Johnson's and Mathis' municipal and supervisor derivative § 1983 and § 1985 claims based on their negligent hiring of and failure to train Officer Koehler, as well as Plaintiffs Darwin Johnson's and Mathis' municipal and supervisor derivative § 1983 and § 1985 claims based on the institution and maintenance of a widespread discriminatory

2

policy.

6. **Against Lt. Croyle**. Plaintiffs Darwin Johnson's § 1983 claim for illegal seizure (malicious prosecution). Plaintiffs Darwin Johnson's and Mathis' § 1985 claim for civil conspiracy.

7. **Defendant Sgt. Jernigan**. Plaintiff Darwin Johnson's § 1983 claim for illegal seizure (malicious prosecution). Plaintiffs Darwin Johnson's and Mathis' § 1985 claim for civil conspiracy.

## II. FACTS

The facts, stated in the light most favorable to the Plaintiffs,[2] are as follows.

### A. Events of April 17, 2011

On April 17, 2011, Plaintiff LaTonja Johnson ("Mrs. Johnson") was patronizing a local McDonald's Restaurant on Raeford Road via its drive thru. Dep. of LaTonja Johnson [DE-219-5] at 9, 70. Mrs. Johnson's mother-in-law, Plaintiff Brenda Mathis ("Mrs. Mathis"), also was in the vehicle. *Id.* at 9. This McDonald's franchise offers customers the option of ordering their food at one of two drive-thru lanes. *Id.* at 70-71. The lanes then merge together after the drive-thru order speaker. *See* Overhead View of McDonald's [DE-243-4].

Mrs. Johnson lined up in the outside lane ("Lane Two"). Dep. of LaTonja Johnson [DE-219-5] at 71. Defendant St. John was waiting in the inside lane ("Lane One"). *Id.* at 79. Defendant St. John yelled and screamed at Mrs. Johnson, saying Mrs. Johnson cut in the line. *Id.* at 80. Mrs. Johnson placed her order in Lane Two and then moved her car forward in the

---

[2] The parties have filed various objections to each others' assertions of fact. This recitation of the facts represents the court's determination of which facts are supported by evidence which would be admissible at trial.

direction of the cashier, and stopped behind the other vehicles waiting in line. *Id.* 73. Defendant St. John placed her order in Lane One after Mrs. Johnson had placed her order. *Id.* at 75. Defendant St. John then drove her truck over the curb to the left of her truck, and in the process of doing so, struck Mrs. Johnson's vehicle. *Id.* at 75-76. While she was driving over the curb and striking Mrs. Johnson's vehicle, Defendant St. John yelled that she had the police on the phone. *Id.* at 89-90. Defendant St. John then proceeded to the cashier. *Id.* 90-91. Mrs. Johnson put her vehicle in park, and called her husband, Plaintiff Darwin Johnson ("Mr. Johnson"), and then 911. *Id.* at 89-90. After purchasing her food at the window, Defendant St. John drove her car around the McDonald's building and parked her car across the parking lot in view of Mrs. Johnson's vehicle. *Id.* at 92-93. Mrs. Johnson kept her car in the drive-thru while waiting for the police. *Id.* at 91. She exited her vehicle and stood next to it, along with Mrs. Mathis and the manager of the McDonald's, Elizabeth Johnson.[3] *Id.* at 93.

While Defendant St. John drove through the parking lot and after she parked her truck, she yelled out the window of her truck several times that she knew members of the Fayetteville police department ("FCPD"). *Id.* at 99. Mrs. Johnson told Manager Elizabeth Johnson that Defendant St. John better not get out of her truck. *Id.* at 95. Mrs. Johnson also eventually asked Defendant St. John, "What does that mean?" in response to St. John's statements that she knew members of the FCPD. *Id.*at 95-96. According to Mrs. Johnson, Defendant St. John told her to wait and see, and that they were going to take care of her. *Id.* at 99, 130-31.

Defendant St. John had three children in her truck with her: her son and daughter, and the son of her fiancee. Dep. of Heather St. John [DE-323-1] at 18-19. After her collision with Mrs.

---

[3]  Elizabeth Johnson is no relation to the Plaintiffs in this action.

Johnson, she called Defendant Officer Jennifer Rodriguez, the mother of her fiancee's son and an officer with the FCPD. *Id.* at 41, 57-58. Defendant St. John told Officer Rodriguez she had been in accident, and told her that her son was fine. *Id.* at 58. Defendant St. John also said that the other lady involved in the accident was yelling at her. Dep. of Jennifer Rodriguez [DE-323-2] at 14. Officer Rodriguez told St. John to roll up her windows and call 911. *Id.* at 14. They ended the phone call, and Defendant St. John called 911. Dep. of Heather St. John [DE-323-1] at 59. St. John told the dispatcher she had been in an accident at McDonald's, she had her children with her, and the other driver was yelling and swearing. *Id.*

After Mr. Johnson arrived at the scene, he stood with Manager Elizabeth Johnson next to the Plaintiffs' vehicle, while Mrs. Johnson and Mrs. Mathis stood in parking spaces with a family friend, Lillie Shelton, whom Mrs. Johnson had called after the accident. Dep. of LaTonja Johnson [DE-219-5] at 100.

Defendant St. John stayed on the phone with the dispatcher until Officer Rodriguez called again. During their second conversation, Officer Rodriguez could hear the children crying, and could hear background noises of someone yelling. Dep. of Jennifer Rodriguez [DE-323-2] at 16. Defendant St. John told Rodriguez that family members of the other driver had arrived, and they were around her truck. *Id.* at 20. Officer Rodriguez told St. John not to have any communication with the other driver and to wait for the police. She also told St. John that she was going to call to see if the police had anyone reporting to the scene. *Id.* at 16. Officer Rodriguez then called the 911 dispatch center, and asked if they had any anybody en route to the McDonald's. *Id.* at 17. She was told they did not. *Id.* She then called the watch commander officer's and spoke to Lt. Croyle, telling him that her son's "stepmother" was involved in a

wreck at McDonald's and that dispatch had no one to send. *Id.* at 39. Lt. Croyle told her he didn't have anyone to send, so Officer Rodriguez then called another watch commander's office, and spoke to Lt. Tew. *Id.* at 40-41. He too indicated he had no one to send to the scene. *Id.*

Although Officer Rodriguez denies speaking to anyone else in the FCPD about the situation, Defendant Phyllis Jernigan, a patrol sergeant with the FCPD, contends that Officer Rodriguez called her and told her that Rodriguez's babysitter was involved in an accident, Rodriguez's son was in the car, and people were surrounding the babysitter's car. Dep. of Phyllis Jernigan [DE-219-6] at 10-11, 91. Sgt. Jernigan testified that at that time Officer Rodriguez called her, she already had dispatched Officer Koehler to the scene. *Id.* at 10-12, 135-36. When she got off the phone with Officer Rodriguez, Sgt. Jernigan called for someone to back-up Defendant Koehler. *Id.* at 93.

Officer Koehler testified that he received a call from Sgt. Jernigan, informing him there were vehicles involved in an accident in the parking lot of a McDonald's and several people were surrounding one of the vehicles. Dep. of Shane Koehler [DE-219-1] at 80-81. Sgt. Jernigan directed Koehler to respond to the scene, and told him she would send someone else to assist him as soon as she could. *Id.* at 81-82. At the time Officer Koehler received Sgt. Jernigan's directive, he was at the scene of a traffic accident. He left that scene to respond to the reported active disturbance at McDonald's. *Id.* at 82-83.

Meanwhile, Defendant St. John called 911 again, and the dispatcher told her to keep her windows rolled up and not to do anything because police were arriving. Dep. of Heather St. John [DE-323-1] at 60. Officer Koehler arrived at the McDonald's and parked next to Defendant St. John's truck. Dep. of LaTonja Johnson [DE-219-5] at 102. Defendant St. John told the

dispatcher an officer had arrived, and the dispatcher told St. John to let him know where she was by waving to him. Dep. of Heather St. John [DE-323-1] at 62, 64.

When Officer Koehler exited his patrol car, he screamed "move the vehicle, move the vehicle, move the vehicle" at Plaintiffs. Dep. of LaTonja Johnson [DE-219-5] at 103. He then went to Defendant St. John, spoke to her for a few seconds, during which time Defendant St. John pointed across the parking lot toward Plaintiffs. *Id.* at 103, 132. At this time, Lillie Shelton said to Mrs. Johnson, "Why is he going to her vehicle first?" *Id.* at 112. Officer Koehler then stormed across the parking lot toward Plaintiffs running and yelling. *Id.* at 103-04. Officer Koehler yelled to move the "fucking vehicle," and when Mr. Johnson responded "I can't," Officer Koehler grabbed him and started kicking him, attempting to take him down. Dep. of Darwin Johnson [DE-219-7] at 59. A male bystander at the scene told Mr. Johnson not to resist, and Mr. Johnson raised his hands in the air and said he was not resisting. *Id.* at 86-87. Officer Koehler then shoved and pushed Mr. Johnson across the parking lot, into the side of his patrol car. *Id.* at 87-88. Mr. Johnson fell to the ground. *Id.* at 89. Officer Koehler handcuffed him and then put him in the police car. *Id.* at 94, 242. Mr. Johnson's mother, Mrs. Mathis, approached Officer Koehler and told him what he was doing to her son was unnecessary. Officer Koehler pushed Mrs. Mathis away and into the side of the patrol car. Dep. of Shelton [DE-219-8] at 52-53.

Defendant. St. John called 911 again, and said more police were needed. Dep. of Heather St. John [DE-323-1] at 87. Lillie Shelton also called 911. Dep. of LaTonja Johnson [DE-219-5] at 85. According to Mrs. Johnson, Officer Koehler than radioed that all calls regarding the McDonald's should be cancelled. *Id.* at 191. Mrs. Johnson then called 911 again. *Id.* at 191-92.

Sgt. Jernigan received a call from Officer Koehler that a supervisor was needed at the McDonald's because of damage to city property. Dep. of Phyllis Jernigan [DE-219-6] at 28. When Sgt. Jernigan arrived at the scene, she first approached St. John, and spoke with Officer Rodriguez on St. John's telephone, telling her that everyone was okay, but someone had to be arrested. Dep. of Rodriguez [DE-219-9] at 21; Dep. of Shelton [DE-219-8] at 115-16. Sgt. Jernigan then spoke with Officer Koehler, who told her that when he first arrived on the scene, he saw a woman in a black truck mouth "help me" and he walked over to her first. Dep. of Phyllis Jernigan [DE-219-6] at 29. As he approached the black truck, he heard someone remark about who he was going to first. He made sure the driver of the truck was okay, and then started to walk toward a group of women, but then saw a McDonald's employee and instead approached her. *Id.* at 29-30. After speaking with the McDonald's employee, he then started to walk toward the group of women, when a man approached him in a very aggressive manner. *Id.* at 30-31. Officer Koehler told Sgt. Jernigan that he attempted to arrest the man, tried to kick the man's feet out from under him, and struggled with the man. According to what Officer Koehler told Sgt. Jernigan, both men ended up hitting Officer Koehler's vehicle and putting a dent in it. *Id.* at 31.

Sgt. Jernigan then initiated a use of force investigation. When she spoke with Mr. Johnson, he asked her what he was being charged with. Dep. of Darwin Johnson [DE-219-7] at 97-98. Sgt. Jernigan did not answer his question, but asked whether he needed an ambulance. *Id.* She also took photographs of Mr. Johnson at the scene. Dep. of Phyllis Jernigan [DE-219-6] at 38. Sgt. Jernigan took the verbal statements of Mrs. Johnson, Mrs. Mathis, Mrs. Shelton, Ms. St. John and Elizabeth Johnson. *Id.* at 64-66. Mrs. Johnson gave a written statement to Sgt. Jernigan on the scene, but Mrs. Mathis and Mrs. Shelton wanted additional time to write their statements.

Dep. of LaTonja Johnson [DE-219-5] at 171. Sgt. Jernigan told Mrs. Johnson that Officer Koehler had been responding to a disturbance call that a group of angry black people had surrounded a person in a vehicle. *Id.* at 144-45.

Officer Koehler transported Mr. Johnson to the police station. Dep. of Darwin Johnson [DE-219-7] at 98. Mr. Johnson testified that he had a conversation with Officer Koehler:

> I asked him why he was doing this. I asked him did he take pleasure in doing the things that he does, that he was doing. He didn't say anything, but he did tell me that he used to be in the Army. I think he said he was a sergeant, if I'm not mistaken, told me he got out of the Army. He told me he had PTSD. And I didn't ask him whether that was the reason why he got out of the Army, but, you know, he said he got out of the Army, and then we continued small talk, as far as the Army. He told me which type of unit he was in, but I don't remember, because I remember telling him that I was in the signal [corps], that I had been in artillery most of my time.
> And he stopped talking after I asked him again why was he doing this, did he take pleasure in doing what he's doing and what did I do, and he just stopped talking to me.

*Id.* at 98-99. Mr. Johnson observed Officer Koehler filling out a report of the arrest on his computer in the front of the patrol car, and saw that Officer Koehler had listed "Officer Lewis" as a witness. Mr. Johnson asked Officer Koehler who Officer Lewis was, and Koehler then removed that from the report. *Id.* at 99-100. Ultimately, Officer Koehler did not list any witnesses in his report of the arrest of Mr. Johnson. Dep. of Shane Koehler [DE-219-1] at 171-73.

Mr. Johnson was charged with Assault on a Government Official ("AOGO"). Magistrate Judge Nicholas Sisk found that there was a probable cause to arrest Mr. Johnson:

> I, the undersigned, find that the defendant named above has been arrested without a warrant and the defendant's detention is justified because there is probable cause to believe that on or about the date of offense shown and in the county named above the defendant named above unlawfully and willfully did assault

9

OFFICER S. KOEHLER 262, a government officer of the FAYETTEVILLE POLICE DEPARTMENT by PRESENTING AN UNEQUIVOCAL APPEARANCE OF AN ATTEMPT OR THREAT, BY PHYSICAL FORCE AND VIOLENCE, TO IMMEDIATELY PHYSICALLY INJURE OFFICER KOEHLER, IN THAT HE WAS IN EXTREMELY CLOSE PROXIMITY TO THE OFFICER USING A HARSH TONE OF VOICE AND PRESENTING OTHER BODY LANGUAGE TO DEMONSTRATE AN IMMINENT ACT OF AGGRESSION. At the time of the offense the officer was discharging the following duty of that office INVESTIGATING AND CONTROLLING A SCENE OF A MOTOR VEHICLE ACCIDENT.

April 17, 2011, Magistrate Order [DE-243-10]. Mr. Johnson contends that the Magistrate did not originally issue the order, and did so only after Officer Koehler altered his original statement to say that Mr. Johnson put his hands on Koehler. Dep. of Darwin Johnson [DE-219-7] at 282-84. Officer Koehler testified that he did, in fact, go in front of the magistrate twice, but it was because he attempted to charge Mr. Johnson with both AOGO and damage to government property, and the magistrate judge found there was no probable cause as to the damage charge. Dep. of Shane Koehler [DE-219-1] at 252-54. Officer Koehler testified that he had to redo the form to apply for probable cause to reflect only the AOGO charge. *Id.* at 255. Officer Koehler also testified that he told the magistrate that Mr. Johnson had put his hands on him. *Id.* at 252. Mr. Johnson was released that afternoon on an unsecured $500.00 bond.

The next day, Mrs. Johnson and Mrs. Mathis, along with Mrs. Shelton, turned in their written statements to the FCPD. Dep. of LaTonja Johnson [DE-219-5] at 16. Sgt. Jernigan continued to be in charge of the investigation of Officer Koehler's alleged use of excessive force.

**B.**     **Investigation into Officer Koehler's Use of Force**

As part of her investigation, Sgt. Jernigan completed an Investigative Contact Checklist, which reflected that Officer Koehler, Mrs. Mathis, Mrs. Shelton and Mr. Johnson gave her verbal

statements on April 17, 2011. *See* Investigative Contact Checklist [DE-244-5]. The Checklist also reflected that Mrs. Johnson and Ms. St. John gave Sgt. Jernigan verbal and written statements on the same date. *Id.* Sgt. Jernigan listed Elizabeth Johnson as the "McDonald's Manager" and stated "no video did not witness anything." *Id.* The Checklist also reflects that Sgt. Jernigan sought video from a Lowe's store near the McDonald's, but the store did not have any. *Id.*

Sgt. Jernigan submitted an 11-page report on her investigation into Officer Koehler's use of force on April 23, 2011. *See* 4/23/11 Memo [DE-323-13]. The report detailed each of the witnesses' statements to Sgt. Jernigan. Notably, Sgt. Jernigan reported that Mrs. Johnson, Mrs. Mathis, and Mrs. Shelton all stated that Darwin Johnson stepped between Mrs. Johnson and Officer Koehler in order to protect his wife. *Id.* at 5-6, 9-10. Sgt. Jernigan reported that Mr. Johnson, however, stated that no one was near Officer Koehler or him when the altercation occurred. *Id.* at 10. Sgt. Jernigan also reported that Elizabeth Johnson said she did not see the accident or the altercation between Officer Koehler and Mr. Johnson. *Id.* at 11. She concluded the report with the following:

> After reviewing all the fact [sic] I have gathered, it is my opinion that Officer Koehler did not violate any Departmental Rules and Regulations, General Orders or Operating Procedures. The fact that Mr. Darwin Johnson's verbal statement to me contradicts his family's statement which leads me to believe Officer Koehler used the minimal amount of force (Hands On) necessary to affect the arrest.

> I reviewed Officer Koehler's personnel file on April 27, 2011. Officer Koehler does not have any disciplinary action against him dealing with Use of Force. I recommend that Officer Koehler be exonerated and this case be considered closed.

*Id.* at 11-12. Sgt. Jernigan submitted the report and entire file to Lt. Oates, who also concluded

that Officer Koehler should be exonerated. Lt. Oates then forwarded the file to Captain Anthony

Kelly. After reviewing the entire file, Captain Kelly issued a memorandum on May 2, 2011 [DE-

244-7], recommending that Officer Koehler be exonerated for the use of force but receive a

Corrective Action for Unsatisfactory Performance for failing to obtain a potential witness's

information.

Subsequently, however, Captain Kelly sent a note to Lt. Croyle, one of Sgt. Jernigan's

superior officers, stating the FCPD's Office of Professional Standards received a written

statement from the McDonald's manager, and the statement "does not look upon Officer Koehler

favorably." Kelly-Croyle Note [DE-220-1]. The note continues:

> My question is why Sgt. Jernigan or Officer Koehler couldn't find this person. I
> need you to be [the] filter between the Sgt. and myself. Now, I need you to revisit
> this file and question the manager who wrote the statement to get their side. Their
> statement is consistent with the complaints [sic] statement. I need you to complete
> a memo for the file and make any changes to your finding if any.
> I have my concerns with Officer Koehler; his name comes across my desk quite a
> bit. I really need you to take a good look at this situation to make sure he didn't
> violate policy. Also, there should be an alert coming down to your Sgts; make
> sure someone takes a good look at his [Internal Affairs] track to make real sure he
> doesn't have a problem that we are missing.

*Id.* The written statement from the McDonald's manager, Elizabeth Johnson, included the

following:

> One of my employees . . . came and told me that two customers were arguing
> cause they had got in an accident. I went outside to see what was going on the
> lady in the SUV was on the phone with the police and thought at first the other
> lady, in the big truck, drove off, but then another customer told us she continued
> to go and get her food. When she was finished getting her food she parked in the
> rear of the store. By that time I was already speaking with the lady in the SUV
> and then her husband pulled up. They [sic] lady in the SUV did tell the lady in the
> truck she better not get out of her vehicle. I stayed out there calming the situation.
> Then the lady in the truck said she knows the Fayetteville PD a few times. So then
> the lady in the SUV lady was like so and then the lady in the truck kept saying, "I

am not talking to you." We continued to wait for the police the lady's [sic] from the SUV went over the side parking spaces and were talking. I was standing near the DT [drive-thru] speaker talking to the SUV lady's husband. Everyone was fine and calm by this time. Then the officer came up, he parked next to the lady in the truck and said is that our [sic] truck in the DT to the lady in the SUV you need to move it. He did not look at the way it was positioned nothing. Then he went to the lady in the truck and the SUV lady was like ok so you are going to her first. I understood why they felt that day cause the lady in the truck already said that she knew the police. Then the officer came over screaming and got toe to toe with the lady in the SUV's husband. I did not see the husband put his hands on the officer. I was walking over there to say something to cause by then the situation was already out of hand and the officer could have diffused it by just claming [sic] everyone and not getting in their face. Then the officer started to try and drop the husband to the ground.  A man came from the side and said don't resist (built Hispanic looking man) and the husband put his hands up and said I am not resisting. Then the officer lunged him in to the car and at that time the man's mother was right there. She was trying to say no office stop and as she got closer he pushed her. Then he put him in the car. By then the SUV lady was already calling the police again because of the way he was acting and he radioed to cancel the call. After this I went to see what my employee saw and he was telling me that they were fussing over what happened then the lady in the truck ran up over the curve and on the grass to get around and get her food.

4/20/2011 Elizabeth Johnson Statement [DE-243-7].

Lt. Croyle attempted to contact Elizabeth Johnson several times, but it took approximately two to three weeks to actually make contact with her. Dep. of Kevin Croyle [DE-246-2] at 15. Lt. Croyle met with Elizabeth Johnson at McDonald's on May 21, 2011. *Id.* at 16. He subsequently issued a memorandum that stated in part the following:

> On 5-7-2011 I was tasked to follow-up on this investigation due to a statement received from Elizabeth Johnson, the General Manager of McDonalds. The statement was written prior to her having a follow-up conversation with Sgt. Jernigan, and she said her perception has changed since learning more facts about the incident, and this will be addressed below.
> . . .
> I met with Ms. Johnson on 5-21-2011 at 1230 hours and spoke with her in depth about her statement and other issues surrounding this event. . . . She went outside several minutes after the crash to see what was happening. . . .
> Officer Koehler pulled into the PVA, stopping between the SUV in the

drive-thru and the truck belonging to the W/F. He looked around and went almost immediately toward the truck with the W/F driver. The group near the manager began shouting that he was going to the white lady first. Officer Koehler told them that he would be with them in a minute. She said that Koehler was at the truck with the W/F for a few seconds and then he walked around toward the drive-thru and immediately said to the group to move the SUV from the drive-thru. The B/M (Darwin Johnson) quickly approached Officer Koehler at the front of the patrol vehicle and told him he could not move the vehicle. Koehler told him again to move the vehicle and Johnson said he couldn't. (This contradicts with the statement written by the manager in that she wrote that "the officer came over screaming and got toe to toe" with the black male. In fact, Darwin Johnson came across the PVA to confront Officer Koehler. Koehler was speaking loudly due to the distance, as was Mr. Johnson.

Ms. Johnson was approximately 50-75 feet from where the altercation involving Officer Koehler took place. She said she was unable to see everything that happened due to the vehicles and positioning, but she was able to hear some of the conversation. She said that the officer and black male were toe to toe and that she felt the officer should have stepped back a step or two to diffuse the situation. (She explained that this is what McDonalds' managers are trained to do.) I explained to her that the officer does not have a duty to retreat, and that although there is a chance that it could have diffused the situation, it could have made the situation worse as an aggressive subject may see this as a weakness and attack the officer.

Ms. Johnson said that after she was informed of the nature of the call that Koehler was responding to, she has a different perspective. She said that although her initial perspective was that perhaps the officer knew the W/F, and that he was taking her side, that she can now understand why he went to her first. She also said that although she initially thought the officer should have backed off, she can now see that if the B/M had not gone aggressively toward him initially, or had said he was not the driver, (did not have keys), or even if the B/M just stepped back himself, that this could have been avoided.

In conclusion: . . . . Ms. Johnson had spoken only to the occupants of the SUV and their family, and had a limited view of the incident. Ms. Johnson had a preconceived idea of what was taking place due to the statements of the W/F in the truck. She also had a lack of knowledge on police duties and responsibilities, as well as the actual information provided to the officer prior to his arrival. This led her to make assumptions based on misinformation and misperception. . . . Aside from those involved, Ms. Johnson was the only identifiable witness to the ensuing altercation. Her written statement and the statements given to Sgt. Jernigan and me have discrepancies, which can be attributed to her original perceptions of the incident. Based on all the information available, it is my opinion that Officer Koehler was justified in his use of force based on the actions of the suspect. I have found no other violations.

14

3/22/2013 Memo [DE-263-18]. Elizabeth Johnson later executed an affidavit detailing what she witnessed on April 17, 2011. The statements in the affidavit more closely resemble her April 20, 2011 statement than what she allegedly told Lt. Croyle when he interviewed her at McDonald's on May 21, 2011.

On June 4, Legal Adviser Patricia Bryan reviewed and forwarded the file to Chief of Police Thomas Bergamine, who concluded on June 5 that Koehler should be exonerated for the use of force but disciplined for violation other than the complaint ("VOTC"). The investigation was closed by the Office of Professional Standards on June 14. *See* Investigative Review Sheet [DE-244-5]. On June 28, 2011, Sgt. Brewington, Officer of Professional Standards & Inspections, made a final recommendation that the use of force investigation be closed and Koehler exonerated, but that a corrective action be taken for the VOTC. *See* 6/28/2011 Letter [DE-248-4]. On July 21, 2011, the FCPD sent Mrs. Johnson a letter stating that "appropriate action" had been taken with regard to her complaint against Officer Koehler. *See* 7/21/2011 Letter [DE-248-5].

On September 20, 2011, Sgt. Jernigan issued a memorandum for the record, stating that she was given the case file back in reference to Mrs. Johnson speaking at an open forum about the events of April 17, 2011. *See* 9/20/11 Memo [DE-219-25]. After reviewing a CD/DVD and audio CD containing Mrs. Johnson's remarks, Sgt. Jernigan was of the opinion that "there should be no changes to the original file." *Id.* Sgt. Jernigan specifically found that Mrs. Johnson's statement at the forum

> did not differ from her statement to me on April 17, 2011.
> Mrs. Johnson stated that her husband jumped in front of her to protect her from

Officer Koehler. I spoke with Mr. Johnson after he was placed into the back seat of Officer Koehler's patrol car. Mr. Johnson advised me that he did not jump to the defense of his wife and that his wife was not even near him or Officer Koehler at the time of altercation. The Assistant Manager (Elizabeth Johnson) of the McDonald's stated that Mr. Johnson approached Officer Koehler in an aggressive manner.

Ms. Lillie Shelton's statement to me on April 17, 2011, and her statement to [the forum] did not seem to differ.

*Id.*

## C.    Officer Koehler's Career

Prior to being hired by the FCPD, Officer Koehler served in the United States Army and was a decorated combat veteran. Dep. of Shane Koehler [DE-219-1] at 53, 248. While serving in the military, Koehler sought some forms of therapy intermittently after critical events occurred during his deployment. *Id.* at 65-66.

Koehler began the application process for the FCPD in 2009. At the same time, he also was seeking benefits from the Veterans Administration ("VA"). *Id.* at 226-27. As part of the VA benefits process, he filled out a questionnaire regarding conditions that he encountered while on active duty and reported going to a mental health office while deployed. *Id.* at 227-28; Defendant Koehler's DD Form 2807-1 [DE-263-25].

On May 28, 2009, Koehler signed an Authorization and Release to Obtain Information [DE-244-14] which authorized the City of Fayetteville to conduct a background investigation in connection with his application for employment. The authorization stated that the investigation "may include information from . . . military units and organizations . . . [and] any physical or medical records . . . ." *Id.* Koehler also completed a Form F-3 Personal History Statement [DE-244-15], and the City conducted criminal history checks [DE-248-8], which were negative, and obtained a credit report on Koehler [DE-248-9]. Koehler was then interviewed by a panel of

16

three FCPD employess who documented his performance on the F-4 Qualifications Appraisal Interview form [DE-248-10] and recommended that he be hired. The FCPD then issued employment and personal reference questionnaires [DE-248-11] which were completed by individuals with first-hand knowledge of Koehler, and all offered positive feedback.

The FCPD then issued a conditional offer of employment to Koehler [DE-248-12]. Koehler was given a complete medical evaluation documented on the F-1 Medical History Statement [DE-248-13] and F-2 Medical Examination Report [DE-248-14]. Koehler did not report any psychological issues. He also was given a psychological evaluation, including four psychological and personality inventory screening tests, which was conducted by Dr. W. Presley Keeton [DE-244-16]. Dr. Keeton concluded that Koehler "is an acceptable candidate for training and service as a law enforcement officer" and there were "no significant indications of risk." Koehler also completed a polygraph examination [DE-248-16] that did not reveal any deception.

Koehler's background investigation was conducted by Officer Dan Holloway, who documented the investigation on a Form F-8 Mandated Background Investigations Form [DE-248-17]. As part of the process, Holloway interviewed Koehler's Army supervisors, First Sergeant Smith and Staff Sergeant Eddy, who gave Koehler positive recommendations and reported that he was separating from the Army due to asthma. After Holloway's background investigation was complete, Training Lieutenant Laura Kruger recommended that Koehler be hired [DE-248-21]. Koehler began training at the police academy on August 10, 2009, and graduated on December 19, 2009. Dep. of Shane Koehler [DE-219-1] at 29.

In the spring of 2010, Koehler was awarded disability compensation by the VA, 30% of which is for Post Traumatic Stress Disorder, despite not requesting a disability rating based on

PTSD when he was applying for benefits. *Id.* at 182-83. He did not report the PTSD disability rating to his supervisors, because was not aware of any policy requiring him to do so. *Id.* at 185.

Koehler testified that he was first diagnosed with PTSD in April 2011. *Id.* at 57. On April 28, 2011, he told his supervisor, Sgt. Jernigan, about the diagnosis, in accordance with FCPD policy that officers inform their supervisors when they are put on a medication. Dep. of Phyllis Jernigan [DE-219-6] at 142.

Koehler eventually was placed on administrative leave, for reasons unrelated to the April 17, 2011 incident with the Plaintiffs. He was referred to Dr. Keeton for a fitness for duty examination. Koehler later resigned from the FCPD on September 1, 2011 [DE-219-27], after Dr. Keeton conducted the fitness for duty evaluation. In November 2011, Dr. Keeton sent to the FCPD his report finding Koehler fit for duty.

**D.    Charges Against Darwin Johnson**

The charges against Plaintiff Darwin Johnson were dismissed on August 18, 2011, because Koehler was on administrative leave and unavailable for court. Dep. of Shane Koehler [DE-219-1] at 224-25.

## III.    STANDARD OF REVIEW

At summary judgment, the court must examine the evidence presented by both parties and determine if there is a need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 283 (4th Cir. 2013). The court examines "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52

(1986). Where the moving party shows that the evidence is so one-sided that it should prevail as a matter of law, the burden shifts to the nonmoving party to come forward with affidavits, depositions, answers to interrogatories, or other evidence demonstrating that there is a genuine issue of material fact that requires trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986); *Matsushita*, 475 U.S. at 587; *Pension Benefit Guar. Corp. v. Beverley*, 404 F.3d 243, 246-47 (4th Cir. 2005). An issue of fact is genuine if a reasonable jury could find for the nonmoving party. *Liberty Lobby*, 477 U.S. at 248. A fact is material if proof of the fact might affect the outcome of the case under the substantive law. *Id.* The facts should be viewed in the light most favorable to the nonmoving party and all reasonable inferences should be made in favor of the nonmoving party. *Id.* at 255; *Smith v. Va. Commonwealth Univ.*, 84 F.3d 672, 675 (4th Cir. 1996).

## IV. DEFENDANT ST. JOHN'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant Heather St. John moves for summary judgment on the 42 U.S.C. § 1985(3) civil conspiracy claims made against her by Plaintiffs Mr. Johnson and Mrs. Mathis, as well as the punitive damages claim asserted against her by all Plaintiffs. For the reasons stated below, St. John's motion is ALLOWED.

### A. § 1985(3) civil conspiracy claim

Title 42 of the United States Code, Section 1985 provides, in pertinent part:

> If two more persons in any State . . . conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the law . . . whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived many have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

19

42 U.S.C. § 1985(3). To maintain a cause of action for conspiracy to deny equal protection of the laws under § 1985, "a plaintiff must prove: (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy." *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995) (citations omitted).

The court previously denied some of the Defendants' motion to dismiss Plaintiffs' § 1985(3) claim, finding at the motion to dismiss stage that Plaintiffs' allegations were sufficient to "satisfy the requirement of a meeting of the minds to retaliate against Plaintiffs and deprive them of the equal enjoyment of rights secured by the law to all." March 28, 2013 Order [DE-129] at 13. This court was "less convinced that Plaintiffs in this case will be able to demonstrate the second element, that the alleged co-conspirators were motivated by class-based discriminatory animus" *id.* at 13-14, but in light of the lenient pleading standard, the court allowed Plaintiffs' civil conspiracy claim to go forward. The court cautioned Plaintiffs, however, that:

> [a] charge of civil conspiracy is a very serious assertion. The court assumes that Plaintiffs' attorney has satisfied his burden under Rule 11 when certifying to the court that the factual contentions made in the Amended Complaint have or will likely have evidentiary support. If, however, Plaintiffs persist in such a claim but fail to elicit any evidence beyond the fact of a brief conversation between Defendants St. John and Koehler, at the very least, the court will not allow speculation or conjecture regarding the possible contents of such a conversation to satisfy Plaintiffs' burden to establish their claim.

*Id.* at 14. The court now finds that Plaintiffs have failed to satisfy their burden in coming forward with evidence, as opposed to speculation or conjecture, that the relevant Defendants were motivated by a specific class-based, invidiously discriminatory animus.

Courts are in agreement that the mere fact that a plaintiff is a member of a protected class is insufficient to support an inference of discriminatory motivation in a section 1985 claim. *See, e.g., Gooden v. Howard*, 954 F.2d 960, 970 (4th Cir. 1992) (observing that the mere statement that a plaintiff is black and the defendant officers are white is insufficient to establish a claim under § 1985(3)); *Gatling v. Atlantic Richfield Co.*, 577 F.2d 185, 188 (2d Cir. 1978); *Jackson v. Hamilton Township*, Civ. No. 10-3989, 2014 WL 1217662, at *7 (D.N.J. Mar. 24, 2014) (finding that a plaintiff failed to produce sufficient evidence to support an inference that he was injured because he black where Plaintiff argued that he was black, officers who allegedly beat him were white, and the entire incident "'smacks' of racial animus"). In this case, the only other evidence Plaintiffs have proffered as to animus—other than the fact of the differing races of the Plaintiffs and Defendants—is (1) Lillie Shelton's testimony that Officer Koehler was responding to St. John's call that her truck was surrounded by a group of angry black people, and (2) various witnesses' perception and feelings that Officer Koehler was racially motivated. *See* Dep. of Lillie Shelton [DE-219-8] at 82-83, 96, 117, 120-21; Dep. of Elizabeth Johnson [DE-292-7] at 147-48. As to the former evidence, it does not seem remarkable that someone making a 911 call would give a description of the people he or she is complaining about. As to the latter evidence, the witnesses' perceptions as to Officer Koehler's motivation are insufficient to establish racial animus. *See Gatling*, 577 F.2d at 188 (allowing summary judgment on a § 1985 claim where the only evidence as to animus was the plaintiffs' belief that the defendants were unhappy about the plaintiffs' race, and remarking that "[p]ermitting a witness to testify solely from observing a person that he is intoxicated is a far cry from permitting testimony that he got drunk because of a fight with his wife").

Plaintiffs also lack sufficient evidence showing that Defendant St. John entered into a conspiracy with the relevant City Defendants. To prove a § 1985 conspiracy, "a claimant must show an agreement or a 'meeting of the minds' by defendants to violate the claimant's constitutional rights." *Simmons*, 47 F.3d at 1377 (citations omitted). "[A]n express agreement is not necessary," although it "must be shown that there was a single plan, the essential nature and general scope of which was known to each person who is to be held responsible for its consequences." *Id.* at 1378 (quotation omitted). This is a "relatively stringent standard" that requires sufficient evidence that the alleged conspirators participated in a joint plan. *Id.* at 1377. When the court ruled on St. John's earlier motion to dismiss—which again, was at the pleading stage of the litigation—the relevant allegations were that (1) Defendant St. John discussed with Officer Rodriguez how to retaliate against Plaintiffs; (2) Defendant St. John, while still on the phone with Officer Rodriguez, spoke with Officer Koehler; and (3) Koehler's subsequent actions were in keeping with Defendant St. John's prior threats. *See* March 28, 2013, Order [DE-129] at 5-8, 12-13. Since that ruling, Plaintiffs have not proffered evidence that supports their initial allegations, nor have they proffered evidence which supports an inference that Defendant St. John entered into a conspiracy with the relevant City Defendants.

Specifically, the evidence, viewed in the light most favorable to Plaintiffs, shows that St. John spoke with Rodriguez and the 911 operator. The evidence also shows that Sgt. Jernigan dispatched Officer Koehler to the McDonald's, prior to speaking with Rodriguez, and did not speak with Officer Koehler again until he radioed that he needed a supervisor on the scene because of damage to city property, which was after he had arrested Mr. Johnson. Dep. of Phyllis Jernigan [DE-219-6] at 10-12, 28, 135-36. Finally, the evidence shows that Officer

Koehler was not aware of Officer Rodriguez's connection to St. John, and his brief conversation with St. John consisted of St. John telling him she rear-ended another vehicle, and he asking for her license and registration. Dep. of Shane Koehler [DE-219-1] at 100-02, 241. This evidence does not suffice to show that there was meeting of the minds between Defendant St. John and the various City Defendants (Koehler, Rodriguez, Jernigan) regarding the deprivation of Plaintiffs' rights. Nor is there evidence showing that Defendant St. John had a meeting of the minds with the various City Defendants *after* Darwin Johnson was arrested.

In light of this insufficient evidence, Defendant St. John's Motion for Partial Summary Judgment [DE-208] is ALLOWED as to Plaintiffs' § 1985 claim against her.

## B.    Punitive Damages

Defendant St. John also moves for summary judgment as to Plaintiffs' claim for punitive damages. With the dismissal of the § 1985 claim against St. John, the only remaining claim against her which could hypothetically support an award of punitive damages is Mrs. Johnson's state-law negligence claim. St. John argues that "[u]nder North Carolina law, the availability of punitive damages in the motor vehicle negligence context, premised on a finding of gross negligence, has been confined to circumstances where at least one of three factors is present: (1) defendant is intoxicated, (2) defendant is driving at excessive speeds, or (3) defendant is engaged in a racing competition." Def. St. John's Mem. in Support of Mot. for Partial Summ. J. [DE-209] at 15 (citing *Yancey v. Lea*, 354 N.C. 48, 550 S.E.2d 155 (2001)).

St. John's argument is somewhat correct; in *Yancey*, the North Carolina Supreme Court, after reviewing the body of North Carolina appellate cases, observed that "[o]ur case law as developed to this point reflects that the gross negligence issue has been confined to

circumstances where at least one of" the three aforementioned factors is present. *Yancey*, 354 N.C. at 53-54, 550 S.E.2d at 158. The Supreme Court also stated, however, that "we do not hold these factors to comprise an exhaustive list from which gross negligence must always be found . . . ." *Id.* at 54, 550 S.E.2d at 158. Accordingly, it appears that under North Carolina law, punitive damages *may be* available in the motor vehicle context even where one of three *Yancey* factors is not present, so long as the requirements of N.C. Gen. Stat. § 1D-15 are satisfied. *See* N.C. Gen. Stat. § 1D-15 (allowing recovery for punitive damages where a plaintiff proves by clear and convincing evidence that (1) fraud, (2) malice, or (3) willful or wanton conduct is present).

Plaintiffs focus the entirety of their argument in opposition to St. John's motion on the actions St. John took with regard to the alleged conspiracy to violate their rights, and do not address what evidence supports a finding of punitive damages with regard to the motor vehicle negligence claim. It is not this court's duty to pick through the record and marshal that evidence for Plaintiffs. Accordingly, Defendant St. John's Motion for Partial Summary Judgment [DE-208] is ALLOWED as to Plaintiffs' claim for punitive damages.

## V.      CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The City Defendants move for summary judgment as to all of Plaintiffs' claims against them.

### A.      Plaintiffs' claims under 42 U.S.C. § 1983

The City Defendants contend they are entitled to qualified immunity on all of Plaintiffs' claims under 42 U.S.C. § 1983. Qualified immunity provides government officials with immunity from suit for money damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable officer would have known."

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Scott v. Harris*, 550 U.S. 372, 377 (2007). Courts ruling on a claim of qualified immunity must consider two questions: (1) "whether the facts that a plaintiff has . . . shown . . . make out a violation of a constitutional right[,]" *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 169 (4th Cir. 2010); and (2) "whether the right was 'clearly established' in light of the specific context of the case." *Scott*, 550 U.S. at 377; *Jones v. Buchanan*, 325 F.3d 520, 526 (4th Cir. 2003). Both inquiries must be answered affirmatively before the court may deny qualified immunity. *Pearson*, 555 U.S. at 232, 235-36. A court has discretion which of the two questions to analyze first. *Id.* at 236. The plaintiff bears the burden of proof on the first inquiry and the defendant bears the burden of proof on the second. *Henry v. Purnell*, 501 F.3d 374, 377-78 (4th Cir. 2007).

With this in mind, the court will turn to each of the Plaintiffs' § 1983 claims.

1.    False Arrest

Plaintiff Mr. Johnson alleges that Officer Koehler falsely arrested him in violation of his Fourth Amendment right to be free from unreasonable searches and seizures. Defendants move for summary judgment on grounds that probable cause existed to arrest Mr. Johnson, or alternatively, Officer Koehler is entitled to prevail based upon qualified immunity.

False arrest claims are analyzed under the Fourth Amendment: arrests are illegal when probable cause did not exist at the time of the arrest. *United States v. McCraw*, 920 F.3d 224, 227 (4th Cir. 1990). Probable cause exists where "the facts and circumstances within the [the officer's] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an

25

offense." *Id.* (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

Here, Mr. Johnson was arrested for AOGO in violation of N.C. Gen. Stat. § 14-33(c)(4). Under that statute, it is a misdemeanor to assault "an officer or employee of the State or any political subdivision of the State, when the officer or employee is discharging or attempting to discharge his official duties." The elements of this offense are: "(1) an assault (2) on a government official (3) in the actual or attempted discharge of his duties." *State v. Crouse*, 169 N.C. App. 382, 387, 610 S.E.2d 454, 458 (2005). Because there is no statutory definition of assault in North Carolina, common law rules govern the crime of assault. *Id.* (citing *State v. Mitchell*, 358 N.C. 63, 69, 592 S.E.2d 543, 547 (2004)). The North Carolina Supreme Court has recognized two rules regarding assault. The first rule defines assault as "an overt act or an attempt, or the unequivocal appearance of an attempt, with force and violence, to do some immediate physical injury to the person of another, which show of force or menace of violence must be sufficient to put a person of reasonable firmness in fear of immediate bodily harm" *Mitchell*, 358 N.C. at 69-70, 592 S.E.2d at 547, and "places emphasis on the intent or state of mind of the person accused." *State v. Roberts*, 270 N.C. 655, 658, 155 S.E.2d 303, 305 (1967). The second rule defines assault as a "show of violence accompanied by reasonable apprehension of immediate bodily harm or injury on the part of the person assailed which causes him to engage in a course of conduct which he would not otherwise would have followed," and focuses on "the reasonable apprehension of the person assailed." *Id.*

The City Defendants contend there was probable cause to arrest Mr. Johnson for AOGO, relying largely on Officer Koehler's version of events leading up to Mr. Johnson's arrest. Although "[t]he immunity question must be filtered through the lens of the officer's perceptions

at the time of the incident in question," *Gandy v. Robey*, 520 F. App'x 134, 140-41 (4th Cir. 2013), this does not mean that disputed issues of material fact are resolved in favor of the officer moving for summary judgment. If Officer Koehler's version of the facts is believed, once Officer Koehler approached Plaintiffs—whom he regarded as agitated and aggressive—Mr. Johnson stepped in front of him and was standing toe-to-toe with him. When Officer Koehler told Mr. Johnson to move the car, Johnson told Koehler, in a low whisper with an underlying growl, not to speak to him that way. In contrast, Mr. Johnson's testimony is that after Officer Koehler spoke to St. John, he came running across the parking lot toward Plaintiffs yelling "whose vehicle, move the fucking vehicle," and when Mr. Johnson tried to say that he could not move the vehicle because he did not have the keys, Koehler began kicking him. Dep. of Darwin Johnson [DE-219-7] at 58-59, 67-68, 70-71. Were a reasonable jury to find Mr. Johnson's testimony credible, it could conclude that no reasonable officer would have believed that Darwin Johnson's statement that he could not move the car, with no other action, constituted an assault under North Carolina law.

The probable cause analysis, however, is not limited to only the crime with which Mr. Johnson was charged. The Supreme Court has explained that an officer's "subjective reason for make the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). Rather, the objective analysis required by the Fourth Amendment under which "'the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Id.* (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)). Accordingly, courts

have concluded that "a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and that it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of the arrest." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006); *see also Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 715 (7th Cir. 2013) ("[A]n arrest can be supported by probable cause that the arrestee commited any crime, regardless of the officer's belief as to which crime was at issue . . . ."); *United States v. McNeil*, 484 F.3d 301, 311 (4th Cir. 2007) ("[T]he arrest is valid if, based on the facts known to the officer, objective probable cause existed as to *any* crime."); *Herbert v. Maxwell*, 214 F. App'x 451 (5th Cir. 2007) ("Applying the *Devenpeck* standard in the qualified immunity context, the inquiry is whether, given the facts known to [the officer], he could have reasonably believed he had probable cause to arrest [the plaintiff] for any crime."); *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1094 (9th Cir. 2006) ("Under *Devenpeck*, the subjective reason that Officer Smith arrested Fullard is irrelevant so long as the available facts suggested that Fullard was committing a crime.").

The City Defendants contend that Officer Koehler had probable cause to arrest Darwin Johnson for a violation of N.C. Gen. Stat. §§ 20-114.1(a) or 20-176(a). The former statute provides that "[n]o person shall willfully fail or refuse to comply with any lawful order or direction of any law enforcement officer . . . related to the control of traffic." N.C. Gen. Stat. § 20-114.1(a). The latter statute provides that "[i]f any person shall willfully and unlawfully resist, delay or obstruct a public officer in discharging or attempting to discharge a duty of his office, he shall be guilty of a Class 2 misdemeanor." N.C. Gen. Stat. § 20-176(a). A violation of either statute requires, at minimum, a showing that a person (1) willfully, (2) disobeyed a lawful order

or direction of (3) a law enforcement officer. *See State v. Dammons*, 159 N.C. App. 284, 294, 583 S.E.2d 606, 612 (2003) ("The elements of obstruction or delay of an officer are as follows: 1) that the victim was a public officer; 2) that the defendant knew or had reasonable grounds to believe that the victim was a public officer; 3) that the victim was discharging or attempting to discharge a duty of his office; 4) that the defendant resisted, delayed, or obstructed the victim in discharging or attempting to discharge a duty of his office; and 5) that the defendant acted willfully and unlawfully, that is intentionally and without justification or excuse."); *Glenn-Robinson v. Acker*, 140 N.C. App. 606, 619, 538 S.E.2d 601, 612 (2000) ("To violate G.S. § 20-114.1(a), plaintiff must have 'willfully' disobeyed a 'lawful order' of a 'law enforcement officer.'"). If the jury finds Mr. Johnson's recollection of the events to be correct, no reasonable officer could believe that Mr. Johnson was willfully disobeying or resisting Officer Koehler's directive to move the vehicle, given that just prior to his arrest Mr. Johnson told Koehler that he could not move the car because he didn't have the keys.

Given the divergent testimony of Officer Koehler and Mr. Johnson, there are disputes of material fact as to whether probable cause existed for Mr. Johnson's arrest barring summary judgment in the City Defendants' favor. Additionally, the factual issues preclude summary judgment on qualified immunity grounds. *See Vathekan v. Prince George's Cnty.*, 154 F.3d 173, 179-80 (4th Cir. 1998). Again, if a factfinder were to find Mr. Johnson's testimony more credible, there is no evidence to suggest that Officer Koehler mistakenly, but reasonably, perceived Mr. Johnson's conduct to be criminal. Accordingly, the City Defendants' Motion for Summary Judgment [DE-240] is DENIED as to Plaintiff Darwin Johnson's § 1983 claim for false arrest.

2.  Excessive Force

The City Defendants also move for summary judgment as to the § 1983 claim based on excessive force asserted by Mr. Johnson and Mrs. Mathis. The City Defendants argue that (1) there is insufficient evidence to establish that Officer Koehler used excessive force with respect to either Mr. Johnson or Mrs. Mathis, and (2) he is entitled to qualified immunity as to both Plaintiffs.

Turning to the first question, the court must determine whether Plaintiffs' claim that Officer Koehler used excessive force "make[s] out a violation of a constitutional right." *Id.* at 232. The Fourth Amendment proscribes the use of excessive force by officers while effectuating an arrest. *Purnell*, 652 F.3d at 531 ("The Fourth Amendment's prohibition on unreasonable seizures includes the right to be fee of 'seizures effectuated by excessive force.'" (quoting *Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006)). In *Graham v. Connor*, 490 U.S. 386 (1989), the United States Supreme Court held that a Fourth Amendment excessive force claim must be analyzed under the standard of "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. In applying this standard, the Fourth Circuit has explained that "the question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Elliot v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (citing *Graham*, 490 U.S. at 396-97); *Jones*, 325 F.3d at 527 (citing *Graham*, 490 U.S. at 396-97). The *Graham* court also noted that district courts must balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing government interests at stake." *Graham*, 490 U.S. at 396 (quoting

*United States v. Place*, 462 U.S. 696, 703 (1983)).

The objective reasonableness standard is "not capable of precise definition or mechanical application[,]" *Bell v. Wolfish*, 441 U.S. 520, 559 (1979), and it "requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. However, in examining the facts and circumstances, district courts should consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*; *see also Jones*, 325 F.3d at 527. The Fourth Circuit has held that the extent of the Plaintiff's injury is also relevant. *Jones*, 325 F.3d at 527; *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994). Finally, "a particular use of force must be judged from the perspective of a reasonable officer on the scene" and not "with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

After viewing the facts in the light most favorable to Mr. Johnson, while simultaneously viewing those facts from the perspective of a reasonable officer, the court cannot say that Officer Koehler's use of force was objectively reasonable as a matter of law. Again, the evidence viewed in the light most favorable to Mr. Johnson shows that Officer Koehler ran across the parking lot yelling "whose vehicle, move the fucking vehicle," and when Mr. Johnson said "I can't" and tried to say he did not have the keys, Officer Koehler began kicking him—or used a "leg sweep— to effectuate an arrest. Additionally, although Mr. Johnson did not immediately go the ground, he did put his hands in the air and said "I am not resisting" after which Officer Koehler pushed him 30 feet across the parking lot into the patrol car, causing a dent in the car. Although Officer Koehler argues that he felt threatened by Mr. Johnson, the court would have to credit his testimony, to the exclusion of Mr. Johnson's recollection of the events, given the material

31

dispute as to each man's actions leading up to the arrest. Additionally, although assault on a government official is not a crime to be taken lightly, a reasonable officer would not believe— viewing Mr. Johnson's recollection of events—that Mr. Johnson was actively resisting arrest or fleeing in any manner.

The City Defendants argue, nevertheless, that Mr. Johnson has not presented injuries beyond a *de minimis* nature, and this should preclude a finding that Officer Koehler's use of force was not objectively reasonable. Even if the court assumes that the City Defendants are correct, and Plaintiffs have failed to proffer sufficient admissible evidence of Mr. Johnson's injuries, beyond a *de minimus*, nature, this is not a death knell for his claim, given the record as a whole. *Compare Wilkins v. Gaddy,* 559 U.S. 34, 38 (2010) (explaining that in the context of a claim based on excessive force in violation of the Eighth Amendment that "[i]njury and force . . are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury").

Given that at the time Officer Koehler performed the leg sweep, Mr. Johnson was not threatening anyone, actively resisting arrest, nor attempting to flee, the court cannot say that force used by Officer Koehler was objectively reasonable as a matter of law. This is especially so with regard Officer Koehler's alleged action in pushing Mr. Johnson across the parking lot and into the side of the patrol car after Mr. Johnson affirmatively told Officer Koehler he was not trying to resist arrest and raised his arms. Accepting Mr. Johnson's version of the events as true, as the court must, the court concludes that genuine issues of material fact exist as to whether Officer Koehler used excessive force against Mr. Johnson.

32

Nor can the court answer the second qualified immunity inquiry—whether the right was clearly established at the time of the official's conduct—in Officer Koehler's favor. *Messerschmidt v. Millender*, —U.S.—, 132 S. Ct. 1235, 1245 (2012). In *Hope v. Pelzer*, 536 U.S. 730 (2002), the United States Supreme Court explained that "[f]or a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* at 739 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The Fourth Circuit has held that courts must "'define the right in light of the specific context of the case, not as a broad general proposition . . . that is, [whether it was] clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" *Lefemine v. Wideman*, 672 F.3d 292, 298 (4th Cir. 2012) (quoting *McKinney v. Richland Cnty. Sheriff's Dep't*, 431 F.3d 415, 417 (4th Cir. 2005)), *rev'd on other grounds*, 133 S. Ct. 9 (2012). Cases from the United States Supreme Court, the Fourth Circuit, or the highest court of the state in which the incident took place should be consulted in deciding whether a right was clearly established at the time the incident took place. *Id.* at 299-300. However, the "nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent denial of qualified immunity [because] 'qualified immunity was never intended to relieve government officials from the responsibility of applying familiar legal principles to new situations.'" *Wilson v. Kittoe*, 337 F.3d 392, 403 (4th Cir. 2003) (quoting *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001) (Michael, J. concurring)); *see also Hope*, 536 U.S. at 741 ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.").

In this case, and with regard to Mr. Johnson's claim, the court frames the right as follows:

33

whether, on April 17, 2011, it was clear to a reasonable officer that it was unlawful to effect a leg sweep on a suspect or charge a suspect across a parking lot into a parked vehicle when the suspect is not actively resisting arrest. The court concludes that it was.  Although the precise factual scenario has not been addressed by the Fourth Circuit or the Supreme Court, this court nevertheless finds that precedent from the Fourth Circuit would put a reasonable officer on notice that use of a leg sweep or slamming a suspect in a car, where the suspect is not resisting arrest, violates clearly established law. Fourth Circuit case law clearly establishes that the use of gratuitous force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of officers or the public. *See, e.g., Perry*, 41 F.3d at 174 (denying qualified immunity on the ground that "no reasonable officer could have believed [the officer's conduct to be lawful" after the officer "thr[ew] his weight around [the suspect's] right leg and wrench[ed] [the suspect's] knee" after the suspect allegedly stole a five dollar bill). Officer Koehler therefore had "fair warning" that using a leg sweep to take down Mr. Johnson and subsequently slamming him into a patrol vehicle, when Mr. Johnson was not resisting arrest, was unlawful. He is not entitled to qualified immunity on the excessive force claim.

The court does not so find, however, as to Mrs. Mathis' claim based on excessive force. The record evidence shows that as Officer Koehler was arresting and handcuffing her son, Mrs. Mathis approached Officer Koehler and told him what he was doing was unnecessary, after which Officer Koehler pushed her out of the way and into the door of the patrol car. Plaintiffs concede that Mrs. Mathis suffered insignificant injuries as a result of the shove.

The Supreme Court has observed that "[n]ot every push or shove, even if it may later

34

seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal quotation and citation omitted). This court agrees with the City Defendants that the Third Circuit Court of Appeals' decision in *Jones v. Jersey City*, 45 F. App'x 196 (3d Cir. 2002) (unpublished), although not binding on this court, is still persuasive and indicative that Officer Koehler did not violate Mathis' constitutional right to be free from excessive force. There, the plaintiff contended that "she approached two [officers] who were choking her boyfriend, inquired 'what's going on?,' and was told to shut up by the officers and pushed to the ground [and suffered 'a little bruise' as a result.]" *Id.* at 197. The Third Circuit affirmed the district court's summary judgment in favor of the officers on the basis of qualified immunity, reasoning:

> Jones' excessive force claim also cannot survive the officers' qualified immunity. At worst, she was shoved by an officer after she tried to meddle in an ongoing drug arrest. . . . While some pushes and shoves would violate the Constitution in the right circumstances, it is far from clear that this is one such case. That Jones walked away with a "little bruise" suggests she was not pushed with great force. An officer cannot reasonably anticipate that he will violate the Fourth Amendment every time he uses light force to push away bystanders attempting to interfere with an arrest. Indeed, it is hard to see what alternative options the officer has. Must he try to reason with the interferer while the suspect runs away? Must he carry on with the arrest as if the interferer were not there? A little push is not a clearly unreasonable response in such circumstances.

*Id.* at 198.

So it is here. The court accordingly concludes that Mrs. Mathis has failed to proffer sufficient evidence from which a jury could conclude that Officer Koehler used excessive force against her. Alternatively, the court concludes that it was not clearly established that Officer Koehler's actions against Mrs. Mathis violated her rights, and he is therefore entitled to qualified immunity.

3. <u>Malicious Prosecution</u>

The City Defendants move for summary judgment as to Mr. Johnson's § 1983 claim based on malicious prosecution, arguing that Officer Koehler had probable cause to arrest Mr. Johnson, and that there is no causal link between any named City Defendant and the tort.

The Fourth Circuit has explained that "[a] 'malicious prosecution claim under § 1983 is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort.'" *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (quoting *Lambert v. Williams*, 223 F.3d 257, 261 (4th Cir. 2000)). "To state a claim, a plaintiff must allege that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Id.* (citing *Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012).

In opposition to the City Defendants' motion for summary judgment, Mr. Johnson focuses on his arrest by Officer Koehler. That, of course, was a warrantless arrest, so it cannot be said to have been a "seizure of the plaintiff pursuant to legal process." *Id.; see also Harrington v. City of Nashua*, 610 F.3d 24, 32 (1st Cir. 2010); *Warren v. Montgomery Cnty.*, Civil No. PJM 09-5210, 2012 WL 3779165, at *4 (D. Md. Aug. 30, 2012) ("[L]egal process ordinarily takes 'the form of an arrest warrant (in which case the arrest would constitute the seizure) or subsequent charging document (in which case the sum of post-arraignment deprivations would comprise the seizure).'") (quoting *Nieves v. McSweeney*, 241 F.3d 46, 54 (1st. Cir. 2001)). Mr. Johnson must instead "must demonstrate some post-arraignment deprivation of liberty, 'caused by the application of legal process,' that rises to the level of a constitutional violation." *Warren*, 2012 WL 3779165, at *4. The record is devoid of any evidence that Mr. Johnson suffered any

36

liberty deprivations as a result of the charge brought against him. He was released on an unsecured bond, and was not subjected to onerous travel restrictions. *See Gallo v. City of Philadelphia*, 161 F.3d 217, 222-24 (3d Cir. 1998) (determining that a constitutional seizure existed where the plaintiff was required to attend all court hearings, post a $10,000 bond, maintain weekly contact with pretrial services, and not travel outside New Jersey and Pennsylvania).

Because Mr. Johnson has failed to adduce evidence that he was seized pursuant to legal process, his § 1983 claim for malicious prosecution fails.

4.   Fabrication of evidence

Lt. Croyle and Sgt. Jernigan move for summary judgment as to Mr. Johnson's § 1983 claim asserting that they fabricated and/or concealed evidence in the course of the FCPD's internal investigation.

"The Fourteenth Amendment protects 'against deprivations of liberty accomplished without due process of law.'" *Massey v. Ojaniit*, 759 F.3d 343, 354 (4th Cir. 2014) (quoting *Baker v. McCollan*, 443 U.S. 137, 145 (1979)). Accordingly, the Fourth Circuit has recognized "a due process right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in any investigative capacity." *Id.* (internal quotations omitted).  A successful claim requires evidence that the defendant fabricated evidence, and that the fabrication caused a deprivation of the plaintiff's liberty. *Id.* ("Fabrication of evidence alone is insufficient to state a claim for a due process violation; a plaintiff must plead adequate facts to establish that the loss of liberty . . . resulted from the fabrication.").  In this manner, a plaintiff must show both but-for and proximate causation. *Id.* In other words, a plaintiff must show that

37

the deprivation of his liberty interests was a reasonably foreseeable result of the initial act of fabrication. *Id.*

The City Defendants argue that they are entitled to summary judgment on Mr. Johnson's claim because there is no forecast of evidence that he suffered any deprivation of liberty based on their investigation into the complaint against Officer Koehler's use of force. Mr. Johnson, however, contends that the alleged fabrications of Lt. Croyle and Sgt. Jernigan "resulted in a deprivation of his liberty by the loss of his reputation, a direct attack on his integrity and honor, and damaging his employment status as a sergeant major in the U.S. Army." Mem. in Opp. to City Def's Mot. for Summ. J. [DE-266-1] at 48 (citing *Bd of Regents of State Colls. v. Roth*, 408 U.S. 564, 572-73 (1972)). Specifically, Mr. Johnson argues that had Lt. Croyle and Sgt. Jernigan not fabricated evidence, the FCPD would have made "the proper finding" in its internal investigation into Koehler's use of force, and therefore it could have withdrawn the AOGO charge against Mr. Johnson "while it was pending before the District Attorney." *Id.* at 48. Mr. Johnson further asserts that more than a year after he was arrested, an unidentified person submitted a "military police report" to the United States Army stating that Mr. Johnson had been arrested for AOGO and providing a narrative of the alleged offense. The narrative omitted the fact that the charge had ultimately been dismissed against Mr. Johnson. As a result of the military police report, he was contacted by the Standby Advisory Board ("STAB") and informed of the report and removed from a selection list of candidates to be promoted pending the STAB's review of the charges. Ultimately, Mr. Johnson was reinstated to the selection list; however, he

maintains that the report of the AOGO and STAB report has tainted him, and for all practical purposes, he will not be promoted.

Even if the court assumes that Mr. Johnson has suffered the deprivation of a liberty interest, the court nevertheless agrees with the City Defendants that Mr. Johnson has failed to produce evidence of a causal connection between any action by Sgt. Jernigan and Lt. Croyle in the internal investigation and his professional stagnation in the Army.[4]  As City Defendants correctly observe, Sgt. Jernigan's and Lt. Croyle's reports were submitted to their superiors well after the Magistrate Judge made his probable cause determination. The internal investigation, accordingly, had no impact on the probable cause determination, nor can it be said that the reasonably foreseeable result of any alleged fabrication within the internal investigation would be the dissemination, a year later, of the military police report missing the key information that the charges had been dismissed. *See Massey*, 799 F.3d at 355. Moreover, Mr. Johnson makes it abundantly clear that he believes it was the submission of the military police report which was negatively affected his career prospects. There is no suggestion in the record, however, that either Sgt. Jernigan or Lt. Croyle disseminated their reports, or the military police report, to the United States Army.

Given the lack of a causal nexus between the alleged fabrications of Sgt. Jernigan and Lt.

---

[4] As the City Defendants correctly observe, "injury to reputation by itself [is] not a 'liberty' interest protected under the [Due Process clause]." *Seigert v. Gilley*, 500 U.S. 226, 233 (1991). Rather, "a plaintiff must demonstrate that his reputational injury was accompanied by a state action that distinctly altered or extinguished his legal status" to show a deprivation of a liberty interest." *Shirvinski v. U.S. Coast Guard*, 673 U.S. F.3d 308, 315 (4th Cir. 2012) (citations and quotations omitted).  The court is not convinced that Mr. Johnson's allegations come within the precedent from the Fourth Circuit and the Supreme Court for the establishment of a deprivation of a liberty interest. For that reason, the court has only assumed that Mr. Johnson has adequately shown the requisite deprivation of a recognized liberty interest with regard to

Croyle and the stifling of Mr. Johnson's career, both Sgt. Jernigan and Lt. Croyle are entitled to summary judgment on Johnson's § 1983 claim for fabrication of evidence.

**B.     § 1985(3) civil conspiracy claim against Koehler, Rodriguez, Croyle, and Jernigan**

Defendants Koehler, Rodriguez, Croyle, and Jernigan move for summary judgment as to the civil conspiracy claim asserted against them, arguing that Plaintiffs have failed to adduce evidence of "the meeting of the minds" necessary to establish a conspiracy or a specific, class-based discriminatory animus.   These Defendants also argue that claim is barred by the intracorporate conspiracy doctrine.   Because the court agrees with the City Defendants' first two arguments, it does not reach the intracorporate conspiracy doctrine argument.

As the court explained with regard to the § 1985 claim against Defendant St. John, Plaintiffs have not adduced any evidence that any of the named Defendants had a meeting of the minds to deprive them of the equal enjoyment of rights secured by the law to all; instead, Plaintiffs have relied on their own speculation and conjecture.   Nor have Plaintiffs have come forward with *any* evidence of a specific, class-based animus. Accordingly, Defendants Koehler, Rodriguez, Croyle and Jernigan are entitled to summary judgment on the § 1985 claims against them.

**C.     § 1983 Municipal liability claims**

In addition to imposing liability on Officer Koehler in his individual capacity, Plaintiffs also seek to impose liability under § 1983 against the City of Fayetteville.   Because local government units—like the City of Fayetteville—qualify as "persons" for the purposes of § 1983, they can be liable for damages when they deprive citizens of federal rights.   *See Monell v.*

---

the stifling of his military career.

*New York City Dep't of Social Services*, 436 U.S. 658, 690-91 (1978). Moreover, a plaintiff's claim against a government official in his official capacity is treated as a claim against the government entity of which the official is an agent. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). Consequently, Plaintiffs' claims against Chief of Police Thomas Bergamine and former City Manager Dale Iman in their official capacities are in reality against the City of Fayetteville.

Although a local government entity may be held liable under § 1983, it is well settled that a local government entity cannot be held liable under § 1983 on a *respondeat superior* theory. *Monell*, 436 U.S. at 691. Rather, to establish liability of the entity, a plaintiff must show that: (1) a government actor deprived the plaintiff of her federal rights; and (2) the harm was the result of municipal policy or custom. *Id.* "This requirement limits municipal liability under section 1983 to those actions for which the municipality is actually responsible by distinguishing between acts attributable to the municipality and acts attributable only to municipal employees." *Hill v. Robeson Cnty.*, 733 F. Supp. 2d 676, 683 (E.D.N.C. 2010) (citing *Bd. of County Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403-04 (1997) and *Riddick v. Sch. Bd. of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000)). As this court already has found, Mr. Johnson has proffered sufficient evidence to show that Officer Koehler violated his rights. Accordingly, Mr. Johnson's municipal liability claims may go forward if he proffers sufficient evidence of an official policy or custom of the City of Fayetteville which led to the constitutional violation.

A policy or custom for which a local government entity may be held liable may arise in four ways:

(1) through an express policy, such as written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)). Here, Mr. Johnson contends that he has proffered evidence of both a widespread practice and decisions that manifest deliberate indifference to the rights of African Americans and to citizens who came into contact with Officer Koehler.

    1.    <u>Widespread discriminatory policy</u>

Mr. Johnson argues that the City of Fayetteville had a practice of "widespread bias-based policing." In support of this assertion, he references the City's admitted practice of "hot spot policing" or "active policing" whereby the police department:

utilized an approach to crime reduction, improvement of quality of life, and police department oversight and personnel and resource management utilizing geographic information systems, which mapped crime statistics and identified specific high-crime and problematic areas—a nationally recognized best practice.

City Defs.' Answer to Second Amend. Compl. [DE-201] ¶ 105. Mr. Johnson also references (1) traffic stop data he says shows that African Americans are subject to traffic stops in disproportionate numbers to other categories of citizens; (2) data showing that in 2011 there were 99 use of force complaints made by African American males, while only 19 use of force complaints were made by Caucasian males; and (3) data showing that for the years 2007-2011, large numbers of African Americans were subjected to searches during traffic stops as compared to other categories of citizens. From this, he attempts to extrapolate that hot-spot policing and traffic stops are necessarily intertwined, and are evidence of biased-based policing. He asserts

that "Koehler was operating under this custom and practice of 'active and hot spot' policing when he received the call to go to McDonald's on April 17, 201l regarding a report a car was being 'surrounded by a group of angry Black people'" and that "[t]he public condonation by the Defendant City of its 'active or hot spot' custom or practice . . . was the direct and proximate cause of the constitutional deprivations experienced by the Plaintiffs on April 17, 2011." Pl.'s Resp. to City Def's Mot. for Summ. J. [DE-266-1] at 24.

Even if the court accepts Mr. Johnson's assertions that the disproportionate number of discretionary traffic stops and consensual searches are a product of the City's "hot spot" policing strategy,[5] he has submitted no evidence showing that Officer Koehler was acting pursuant to the "hot spot" policing policy when he responded to call on April 17, 2011. There can be no question that a police officer responding to an active disturbance call is an inherently different situation than a police officer patrolling a designated neighborhood, initiating a traffic stop, and searching a vehicle. Moreover, there is no suggestion in the record that the active disturbance call came from an area determined to be a "hot spot" at the time. Given the fundamental differences between a traffic stop in a "hot spot" area and a response to a call about an active disturbance, the court cannot find that Mr. Johnson has proffered any evidence showing that the "hot spot" policy and the incidents giving rise to this lawsuit are related. Without such evidence, the court concludes that Plaintiffs cannot show that the "hot spot" policing policy was the but-for or proximate cause of Mr. Johnson's injuries caused by his alleged false arrest and Officer Koehler's alleged use of excessive force. *Cf. Carter v. Morris*, 164 F.3d 215, 219 (4th Cir. 1999)

---

[5] Some circuit courts of appeals have recognized that with regard to racial profiling, "statistical evidence of discrimination may be the only means of proving a discriminatory effect." *Bradley v. United States*, 299 F.3d 197, 206 n.11 (3d Cir. 2002); *Chavez v. Illinois State Police*, 251 F.3d 612, 640 (7th Cir. 2001).

(rejecting the plaintiff's claims that "past generalized bad police behavior led to future generalized bad police behavior" as a "nebulous chain [that] fails the rigorous standards of culpability and causation required for municipal liability under section 1983") (quotation and citation omitted).

### 2. Deliberate indifference—failure to train

Mr. Johnson also makes the related argument that the City of Fayetteville "demonstrated a deliberate indifference to the rights of African Americans by steadfastly refusing to acknowledge biased based policing was ongoing through their widespread 'active or hot spot' policing and to correct and/or retrain personnel in order to stop constitutional deprivations." Pl.'s Resp. in Opp. to City Defs. Mot. for Summ. J. [DE-266-1] at 25. He contends that the City showed deliberate indifference to the rights of African Americans by failing to train on biased-based policing and on how to apply probable cause. *Id.* at 26-27.

To impose section 1983 liability on the City of Fayetteville under a theory of deliberate indifference Plaintiff must proffer evidence that a "municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Brown*, 520 U.S. at 411. "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999); *see also Jones v. Wellham*, 104 F.3d 620, 627 (4th Cir. 1997) (explaining that decisions taken by a policymaker may be "clearly unfortunate, might perhaps be thought imprudent, or even be found legally negligent, but that does not suffice; only decisions taken with deliberate indifference to the potential consequences of known risks suffices to impose municipal liability on the basis that such decisions constituted official [municipal] 'policy'"). Deliberate

indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S.at 410. Moreover, even if a plaintiff shows that the municipal action was taken with the requisite degree of culpability, he also "must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* at 404; *see also Lytle*, 326 F.3d at 473 (explaining that to establish a § 1983 claim for failure to train police offices, a plaintiff must show that "officers are not adequately trained in relation to the tasks that the particular officers must perform and this deficiency is closely related to the ultimate injury").

Here, Mr. Johnson relies on the fact that James Buxton, President of the Fayetteville Branch of the NAACP, sent a letter to Iman on October 15, 2010, requesting an investigation of police practices. *See* Oct. 15, 2010 Letter [DE-269-2]. Specifically, the letter stated that data from 2009 showed that "African American drivers stand a much greater chance than white drivers of being stopped for a random search" and posited that the FCPD was engaged in racial profiling. *Id.* The record shows that in response to this letter, Iman and Bergamine attended meeting with community leaders and attempted to provide them with requested records, where they were available. The record also shows that although the City of Fayetteville believed that "the disproportionate number of traffic stops is reflective of active policing in high crime areas which happen to be in predominately African-American communities, and is not based upon race," it nevertheless requested that the United States Department of Justice conduct a "comprehensive evaluation of [the police department's] policies, procedures and actual practices impacting the areas in which there are allegations of misconduct." *See* Dec. 7, 2010, Letter [DE-

269-6].[6] Additionally, Iman and Bergamine attended a "Driving While Black" Forum in March 2011.[7]

Mr. Johnson's argument appears to be that the complaints about racial profiling, and specifically, the allegedly disproportionate numbers of African American males subject to traffic stops and searches during those stops should have put the City on notice that its officers were engaged in racial profiling and/or not applying "probable cause" properly. This, according to him, should have triggered additional training on racial profiling and probable cause, or suspension of the "hot spot" policing policies.

Even if the court accepts all of this as true, it must nevertheless find that—similar to Mr. Johnson's widespread discriminatory policy theory— Mr. Johnson has failed to proffer any evidence which shows causation. Specifically, Mr. Johnson has failed to show a "direct causal link" between "a specific deficiency in training and the particular violation alleged." *Buffington v. Baltimore Cnty.*, 913 F.2d 113, 122 (4th Cir. 1990). Engaging in racial profiling in traffic stops

---

[6] The DOJ ultimately declined to undertake such a review. Although the DOJ noted "that the evidence we have received raises concerns relating to a pattern or practice of biased policing" with regard to traffic stops and searches, it observed that

> the City of Fayetteville and Fayetteville Police Department have taken steps to respond to concerns about biased policing. These efforts are evidenced in part by the City's request for our assistance. In addition, we understand that, since allegations of unconstitutional policing practices arose more than a year ago, FPD has amended policies, attended forums, conducted bias-based police training, and hosted a seminar featuring a representative from DOJ's Community Relations Service to help improve relations with the community. FPD also now requiers officers to give a detailed written reason for each search they conduct based on probable cause. . . . In addition, the police department now requires that officers articulate and document a reason each time they ask motorists for consent to search their vehicles. We have not determined whether Fayetteville engages in biased policing or whether these efforts are sufficient to address any concern.

January 30, 2012, Letter [DE-269-17].

[7] It is apparent that the City took further steps *after* April 17, 2011, including hiring an outside group to conduct a study of its practices. *See* NOBLE report [DE-269-16].

46

and conducting searches during those stops does not make unlawful arrests or excessive use of force when an officer responds to a disturbance call "almost bound to happen, sooner or later, rather than merely likely to happen in the long run." *Carter*, 164 F.3d at 219 (quotation omitted). Mr. Johnson's § 1983 municipal liability claim based of failure to train accordingly fails.

### 3. Deliberate indifference–hiring of Officer Koehler

Mr. Johnson also seeks to impose municipal liability on the City of Fayetteville based on its decision to hire Officer Koehler.

Where a plaintiff alleges that a single deficient hiring decision creates municipal liability, the deliberate indifference standard requires a plaintiff to prove that the applicant's background "would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right[s]." *Brown*, 520 US. at 411. Accordingly, "a finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury" but rather, it depends "on a finding that this officer was highly likely to inflict the particular injury suffered by the plaintiff." *Id.* at 411-12. Thus, "[t]he connection between the background of the particular applicant and the specific constitutional violation alleged must be strong." *Id.* "This strong causal connection exists only where the acts in the defendants' background and the alleged constitutional violations are 'nearly identical.'" *Hill*, 733 F. Supp. 2d at 685 (quoting *Morris v. Crawford Cnty.*, 299 F.3d 919, 923 (8th Cir. 2002)).

Here, Mr. Johnson takes issue with the screening process of Koehler, and specifically, the fact that the City did not request Koehler's medical records from the United States Army and the fact that the psychiatrist conducting Koehler's pre-employment evaluation did not obtain or

47

review Koehler's medical records. Johnson contends that had the City done so, it would have uncovered evidence showing that Koehler had PTSD.

The court agrees with the City Defendants, however, that even if the screening process had reviewed a history suggestive of PTSD, that fact alone would not preclude his employment as a police officer. The only evidence in the record on the issue is the testimony of Dr. Keeton that being diagnosed with PTSD is *not* an automatic disqualifier of a candidate. *See* Dep. of Keeton [DE-247-4] at 16, 45. Nor is there evidence from which the court can say there is a "strong causal connection" between Koehler's mental health history and the constitutional violations at issue in this case. In other words, there is no evidence showing that a prior diagnosis of PTSD would make it highly likely that Koehler would arrest Mr. Johnson without probable cause or use excessive force. Although Mr. Johnson points to examples of Officer Koehler's "violent rages" as evidence that his background and his eventual use of excess force[8] are "nearly identical," the incidents of "violent rages" he references all occurred after he was arrested by Koehler—and accordingly, have no bearing on what the screening before Koehler hired would have shown. Without some evidence that shows that the strong causal connection between Koehler's alleged history of PTSD and his subsequent alleged false of arrest and use of excessive force against Mr. Johnson, Plaintiff has failed to proffer sufficient evidence of deliberate indifference on the part of the City of Fayetteville, and his § 1983 municipal liability claim based on his Koehler's initial hiring fails.[9]

---

[8] Mr. Johnson does not address how a history of PTSD and effecting an arrest in the absence or probable cause is "nearly identical."

[9] To the extent Mr. Johnson asserts a § 1983 municipal liability claim regarding the City of Fayetteville's retention of Officer Koehler, it too fails. All the evidence referenced by Darwin Johnson concerns events that took place after his arrest, and therefore could have not proximately caused his

**E.      § 1983 supervisor liability claims**

Mr. Johnson also seeks to hold Defendants Bergamine and Iman liable on the basis of supervisor liability.  In order to establish a claim for supervisory liability under § 1983, a plaintiff must show:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injuries to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir. 1994) (internal citations omitted).

To establish the first element, knowledge, a plaintiff must show "(1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff." *Id.*  In turn, in order to establish a "pervasive" or "unreasonable" risk of harm, a plaintiff must proffer "evidence that the conduct is widespread, or at least has been used on several different occasions and the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Id.*

To establish the second element, "deliberate indifference," a plaintiff must show "a supervisor's 'continued inaction in the face of documented widespread abuses.' " *Id.* (quoting *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984)).  The Fourth Circuit has counseled that this is a "heavy burden" because:

> [o]rdinarily, [a plaintiff] cannot satisfy his burden of proof by pointing to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence within the area of his

injuries.

49

responsibilities. Nor can he reasonably be expected to guard against the
deliberate criminal acts of his properly trained employees when he has no basis
upon which to anticipate the misconduct. A supervisor's continued inaction in the
face of documented widespread abuses, however, provides an independent basis
for finding he either was deliberately indifferent or acquiesced in the
constitutionally offensive conduct of his subordinates.

*Slakan,* 737 F.2d at 373 (internal citations omitted).

The third element, causation, is established "when the plaintiff demonstrates an 'affirmative causal link' between the supervisor's inaction and the harm suffered by the plaintiff." *Shaw*, 13 F.3d at 799 (quoting *Slakan*, 737 F.2d at 376). "[T]he causal link may be supplied by tort principle that holds a person liable for the natural consequences of his actions." *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983).

Here, Mr. Johnson has failed to proffer evidence with regard to any of the essential elements of a § 1983 supervisor liability against Bergamine and Iman. Specifically, Plaintiff fails to proffer any evidence from which a jury could find that either Bergamine or Iman had actual or constructive knowledge that Officer Koehler had engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to Mr. Johnson. To the extent that Mr. Johnson relies on the behavior of City of Fayetteville police officers generally, for the reasons this court already has discussed, there is insufficient evidence from which a jury could find that Iman's or Bergamine's action (or inaction) caused the constitutional violations at issue in this case. Accordingly, summary judgment is appropriate on the § 1983 supervisor liability claims.

**E.     State law claims**

Plaintiffs also have asserted a variety of state-law claims against the various City Defendants. The City Defendants move for summary judgment as to each of the state-law claims

on various grounds, which the court addresses in turn.

    1.    <u>Governmental Immunity</u>

The City Defendants contend that to the extent that any state-law claim is asserted against the City of Fayetteville or any officer sued in his or her official capacity, the claims are barred by the doctrine of governmental immunity.

In North Carolina, "[a] municipality and its agents are immune from liability for the torts of its officers and employees if the torts are committed while they are performing a governmental function." *Clayton v. Branson*, 153 N.C. App. 488, 493, 570 S.E.2d 253, 256-57 (2002) (quotation omitted). Pursuant to N.C. Gen. Stat. § 160A-485, such immunity may be waived "to the extent that the municipality is indemnified by an insurance contract or a local government risk pool." *Id.* at 257 (citation omitted). Such immunity is waived "only to the extent of coverage provided." *Wright v. Gaston Cnty.*, 205 N.C. App. 600, 606, 698 S.E.2d 83, 88 (2010) (quotation omitted). "A governmental entity does not waive sovereign immunity if the action brought against them is excluded from coverage under their insurance policy." *Patrick v. Wake Cty. Dep't of Human Servs.*, 188 N.C. App. 592, 596, 655 S.E.2d 920, 923 (2008).

Here, the City Defendants have come forward with evidence showing that its liability insurance policy contains an exclusion entitled "Sovereign Immunity Non-Waiver Endorsement" which provides, in part:

> [I]t is here hereby agreed and understood that the policy(ies), coverage part(s) or coverage form(s) issued by us provide(s) no coverage for any "occurrence" . . . claim or suit for which any insured would otherwise have an exemption or no liability because of sovereign immunity . . . . Nothing in this policy, coverage part or coverage form waives sovereign immunity for any insured.

Portions of City Liability Insurance Policy [DE-248-6] at 6. The City Defendants contend that

this exclusionary language is unambiguous, and makes clear that the City, as well as the individual defendants sued in their official capacity, have not waived the defense of governmental immunity.

Plaintiffs make no response to this argument. For the reasons aptly stated by the City Defendants, the court agrees that City, and any of its officers sued in their official capacities, are entitled to governmental immunity to any state law tort claims asserted against them.[10]

2.    Intentional infliction of emotional distress

All three Plaintiffs have asserted a claim for intentional infliction of emotional distress ("IIED") against Officer Koehler in his individual capacity. Under North Carolina law, the essential elements of this tort are: "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe and emotional distress to another." *Dickens v. Puryear*, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981). "The tort may also exist where defendant's actions indicate a reckless indifference to the likelihood  that they will cause severe emotional distress." *Id.* at 452, 276 S.E.2d at 335. Officer Koehler contends that Plaintiffs have failed to proffer sufficient evidence to establish any of these elements.

North Carolina courts have defined the term "severe emotional distress" to mean "any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professional trained to do so." *Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A.*, 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990). Although

---

[10]    Accordingly, the City of Fayetteville is entitled to summary judgment on the state law claim for negligent supervision and retention, which is asserted only against the City.

"[t]he crux of establishing 'severe emotional distress' is that the emotional or mental disorder *may generally be diagnosed by professionals trained to do so . . .* an 'actual diagnosis' by medical professional is not always required or necessary."  *Soderlund v. Kuch*, 143 N.C. App. 361, 371, 546 S.E.2d. 632, 639 (2001) (emphasis in original).  Nevertheless, North Carolina law requires a "high standard of proof" to establish severe emotional distress. *Waddle v. Sparks*, 331 N.C. 73, 83, 414 S.E.2d 22, 27 (1992). The North Carolina Supreme Court has explained that "'[t]he *law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it.*'" *Id.* at 84, 441 S.E.2d at 27-28 (quoting Restatement (Second) of Torts § 46 cmt. j (1965)). Accordingly, a plaintiff must ordinarily "forecast medical documentation or 'evidence of 'severe and disabling' psychological problems within the meaning of the test laid down in *Johnson v. Ruark.*'" *Strickland v. Jewell*, 562 F. Supp. 2d 661, 676 (M.D.N.C. 2007) (quoting *Waddle*, 331 N.C. at 85, 414 S.E.2d at 28).

In opposition to the City Defendants' motion for summary judgment, Plaintiffs point to no evidence to support their claim that Mrs. Mathis experienced "severe emotional distress" as the term is defined in North Carolina case law. Nor do they address Mrs. Johnson's claim. As to Mr. Johnson, he relies on his declaration testimony, wherein he states:

> Since April 17, 2011, I have become developed episodes of depression where it is almost impossible for me to function. . . . After April 17, 2011, my peers look at me differently and I feel constant shame and embarrassment for this incident for which I had no control. I am always depressed and sad and in the last few years, I have cried uncontrollably more than I have all my life. I suffer from sleeplessness and anxiety. The humiliation of the beating in front of my family, being treated as a common criminal has emotional [sic] destroyed me.

Third Decl. of Darwin Johnson [DE-309-3] ¶ 46. Despite his assertion that it has been almost impossible for him to function, Mr. Johnson has not sought any treatment for his emotional distress, other than one visit to a chaplain two to three weeks after the arrest. Dep. of Darwin Johnson Vol. 2 [DE-248-6] at 147. Although the court is cognizant that a medical diagnosis is not always necessary, the court also is aware that "North Carolina courts have found a plaintiff's decision not to seek a medical diagnosis highly probative of the alleged level of distress." *Castonguay v. Long Term Care Mgmt. Servs., LLC*, 1:11CV682, 2014 WL 1757308, at *13 (M.D.N.C. Apr. 30, 2014) (collecting cases). In the absence of evidence concretely detailing his emotional distress, and in the absence of any medical documentation of such distress, this court finds that Mr. Johnson has failed to proffer sufficient evidence from which a jury could find that he suffered severe emotional distress. Accordingly, the City Defendants' motion for summary judgment [DE-240] is ALLOWED as to this claim.

3.     Assault and Battery and False Imprisonment:

Officer Koehler also moves for summary judgment on the assault and battery claims asserted against him by Mr. Johnson and Mrs. Mathis and the false imprisonment claim asserted against him by Mr. Johnson. He argues that these claims are subject to summary judgment for the same reasons he asserted with regard to the § 1983 claims for excessive force and false arrest, and that he also is entitled to public official immunity with regard to these claims.

Under North Carolina law, false imprisonment is "the illegal restraint of a person against his will" and "restraint is illegal if it is unlawful or [without consent]." *Moore v. Evans,* 124 N.C. App. 35, 42, 476 S.E.2d 415, 421 (1996) (citations omitted). "[A] warrantless arrest without

probable cause lacks legal authority and is therefore unlawful." *Id.* (citation omitted). Thus, when a police officer effects an arrest without probable cause, the officer also commits false imprisonment. *Bailey v. Kennedy,* 349 F.3d 731, 742 (4th Cir.2003); *accord Moore,* 124 N.C. App. at 42, 476 S.E.2d at 421. Given the disputed issues of material fact which this court already has discussed with regard to Mr. Johnson's § 1983 false arrest claim, Officer Koehler is not entitled to summary judgment on the state law false imprisonment claim.

As to the assault and battery claim, North Carolina law recognizes that an assault and battery by a law enforcement office may provide the basis for a civil action for damages so long as the plaintiff can show that the force used was excessive under the circumstances. *Acker,* 140 N.C. App. at 625, 538 S.E.2d at 615. In excessive force cases such as this, a "parallel state law claim of assault and battery is subsumed within the federal excessive force claim and so goes forward as well" if the federal claim survives summary judgment. *Rowland,* 41 F.3d at 174. Additionally, North Carolina General Statute Section 15A-401(d) governs the use force by law enforcement, and "in effect proscribes the use of the force by a law enforcement officer if the officer either knows that the arrest is unauthorized or does not have a reasonable belief that the suspect has committed a criminal offense." *Glen Robinson*, 140 N.C. App. at 625, 538 S.E.2d at 615. Accordingly, where the trier of fact must determine the reasonableness of a law enforcement officer's belief that that a plaintiff has committed a criminal offense, the trier of fact must also determine if the law enforcement officer was entitled to use any force at all against the plaintiff. "If [the law enforcement officer] did not have probable cause to arrest plaintiff, [the law enforcement officer] loss the benefit of G.S. § 15A-401(d), and any use of force becomes at least

a technical assault and battery against the plaintiff." *Id.*  Accordingly, Mr. Johnson's assault and battery claim also must go forward.

Nor is Officer Koehler entitled to public official immunity. In North Carolina, official immunity protects a public official performing discretionary acts in the course of his official duties from suit in his individual capacity, so long as the public official acted without malice or corruption or outside the scope of his official duties. *Evans,* 703 F.3d at 656-67. "A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *In re Grad v. Kaasa,* 312 N.C. 310, 313, 321 S.E. 2d 888, 890 (1984). "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." *Id.* at 890-91 (internal quotation marks omitted). Where a defendant has been denied qualified immunity as to § 1983 excessive force and false arrest claims, the Fourth Circuit has found denial of public official immunity on North Carolina common law assault and battery and false imprisonment claims to be appropriate. *See, e.g., Bailey*, 349 F.3d at742-45 (observing that "public officers' immunity, at the least, is unavailable to officers who violate clearly established rights because an officer acts with malice when he 'does that which a man of reasonable intelligence would know to be contrary to his duty'" and determining that officers were not entitled to public officer's immunity on common law claims for assault and battery and false imprisonment for the same reasons why qualified immunity was denied on § 1983 claims). Accordingly, the motion for summary judgment [DE-240] is DENIED as to Mr. Johnson's state law claims for assault and battery and false imprisonment.

56

Mrs. Mathis' assault and battery claim, however, does not survive. Under North Carolina law, "an assault by a law enforcement officer upon a citizen can provide the basis for a civil action for damages against the officer only if a plaintiff can show that the officer used force against plaintiff which was excessive under the given circumstances." *Fowler v. Valencourt,* 108 N.C. App. 106, 114, 423 S.E.2d 785, 790 (1992) (citations omitted). For the reasons already discussed by this court, Mrs. Mathis has proffered insufficient evidence showing that Officer Koehler used excessive force against her. Alternatively, the court finds that she has proffered insufficient evidence showing that with respect to Officer Koehler's conduct toward Mathis, he acted with malicious intent, with corruption, or outside the scope of his official duties. *Thomas v. Holly*, 533 F. App'x. 208, 223-24 (4th Cir. 2013). Accordingly, Officer Koehler is entitled to summary judgment on her claim for assault and battery against him.

## F.     Punitive Damages

The City Defendants move for summary judgment as to any claim for punitive damages. Punitive damages are available in a § 1983 claim only where the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. *Smith v. Wade*, 461 U.S. 30, 56 (1983). To succeed on a claim for punitive damages under North Carolina law, a plaintiff must prove (1) an aggravating factor of fraud, malice or willful or wanton conduct (2) by clear and convincing evidence. N.C. Gen. Stat. § 1D-15. "Willful or wanton conduct" is defined as "the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm." N.C. Gen. Stat. §

57

1D-5(7). Additionally, "willful or wanton conduct" is defined to mean "more than gross negligence." *Id.* This can be shown by a "reckless indifference to the consequences of the act." *Byrd v. Adams*, 152 N.C. App. 460, 462, 568 S.E.2d 640, 642 (2002). For the reasons the court already discussed in connection with public official immunity, the court finds that Mr. Johnson has proffered sufficient evidence with respect to Officer Koehler on the issue of punitive damages.[11] Accordingly, the City Defendants' motion for summary judgment is DENIED as to this issue.

## VI. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs move for partial summary judgment as "to the 42 U.S.C. [§] 1983 False Arrest claim against Defendant Shane Koehler, and the state claims for False Arrest, False Imprisonment, and Malicious Prosecution." Pl.'s Mot. for Partial Summ. J. [DE-238] at 1. The memorandum in support of the motion for partial summary judgment, however, addresses both the § 1983 claim for false arrest *and* excessive force, at least with regard to Mr. Johnson.[12] Moreover, Mr. Johnson did *not* assert a state-claim for malicious prosecution in the Corrected Second Amended Complaint, but rather only a claim for malicious prosecution under § 1983. *See* Corrected Second Amend. Compl. [DE-195] ¶¶ 137-44. He cannot attempt to amend the pleadings now to assert such a claim.

---

[11] Because the court already has determined that no claims survive as to Defendants Rodriguez, Jernigan, Croyle, Bergamine or Iman, any claim for punitive damages against these defendants necessarily fails.

[12] Plaintiff Mathis' excessive force claim does not appear to be addressed at all in the supporting memorandum.

To the extent that the motion for partial summary judgment can be read as applying to Mrs. Mathis' claims, the court finds that the motion must necessarily be denied, for the same reasons stated in connection with the court's allowance of the City Defendants' motion for summary judgment as to her claims. Similarly, to the extent that Mr. Johnson seeks summary judgment on his § 1983 malicious prosecution claim, it too is denied for the same reasons the court has allowed the City Defendants' motion for summary judgment as to that claim.

The court, of course, has denied the City Defendants' motion for summary judgment as to Mr. Johnson's §1983 claims for excessive force and false arrest, and his state-law claims for false imprisonment and assault and battery. This does not mean, however, that Mr. Johnson is entitled to judgment on those claims. When the court views the facts in the light most favorable to Officer Koehler—as opposed to Plaintiffs, which was the view the court took at the outset of the order—the court cannot find that Mr. Johnson is entitled to judgment as a matter of law as to any of the claims. Specifically, for the reasons more thoroughly stated in the City Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment [DE-255], the court finds that when viewing the facts in the light most favorable to Officer Koehler, he did have probable cause to arrest Darwin Johnson for AOGO, and he did not use excessive force against him. Plaintiffs' motion for partial summary judgment [DE-238] is DENIED.

## VII. CONCLUSION

For the foregoing reasons, Defendant St. John's Motion for Partial Summary Judgment [DE-208] is ALLOWED, and Plaintiffs' claims for civil conspiracy under § 1985(3) and punitive damages against St. John are DISMISSED.

Additionally, Plaintiffs' Motion for Partial Summary Judgment [DE-238] is DENIED. Finally, the City Defendants' Motion for Summary Judgment [DE-240] is ALLOWED IN PART and DENIED IN PART. It is DENIED as to Plaintiff Darwin Johnson's (1)§ 1983 claims for false arrest and excessive force against Defendant Officer Koehler, (2) state-law claims for false imprisonment and assault and battery against Defendant Officer Koehler, and (3) punitive damages claims against Defendant Officer Koehler. It is ALLOWED as to the Plaintiffs' remaining claims against Officer Koehler, and their claims against Defendants Rodriguez, Croyle, Jernigan, Iman, Bergamine and the City of Fayetteville.

SO ORDERED. This the 4th day of March, 2015.

James C. Fox
Senior United States District Judge

60